**No. 3508**

Second Circuit

**GILLESPIE ET AL. v. LEE**

(October 1, 1929. Opinion and Decree.)
(November 18, 1929. Rehearing Refused.)
(January 6, 1930. Writs of Certiorari and Review Refused by Supreme Court.)

Foster, Hall & Smith, of Shreveport, attorneys for plaintiffs, appellees.

Pugh, Grimmett & Boatner, and Melvin F. Johnson, of Shreveport, attorneys for defendant, appellant.

WEBB, J. This action was instituted by George E. Gillespie, individually and as the representative of Mary Gillespie, his minor daughter, against F. D. Lee to recover damages alleged to have been sustained, as the result of the negligence of the chauffeur of defendant in driving an automobile owned by defendant against an automobile in which Mary Gillespie was riding, which at the time was being driven by Mrs. Emma C. Gillespie, wife of plaintiff and mother of Mary Gillespie, it being alleged that Mary Gillespie had received injuries at the time of the collision, which had caused the development of pulmonary tuberculosis, and the damages claimed on behalf of George E. Gillespie is the amount alleged to have been expended by him in having his daughter treated for the disease, and on behalf of his daughter for the damages resulting to her from the disease.

There were a number of defenses presented. First, defendant excepted that the petition failed to state a cause of action and in connection therewith pleaded the prescription of one year, and the pleas being overruled, defendant under reservation of his rights answered, pleading in effect a general denial, and in the alternative, contributory negligence.

The accident occurred on March 16, 1925, and trial was had on May 31, 1927, and after conclusion of the evidence the cause was apparently first submitted solely on the questions raised under the general denial; that is, whether or not the evidence established that the chauffeur was at the time of the accident acting within the scope of his employment, and if so, whether the chauffeur was guilty of negligence, and whether or not the evidence established that Mary Gillespie had been injured at the time of the accident, and if so, whether the injury had caused the development of tuberculosis, and on the issue raised under the plea of contributory negligence, as the court first held adversely to defendant on such questions, and tentatively fixed the amount of recovery leaving the latter open to further discussion.

Subsequent to the ruling of the court on those questions, George E. Gillespie died, and Mary Gillespie, who was at the time above eighteen years of age, married E. C. Bowe, and defendant moved for a new trial; while Mrs. Emma C. Gillespie and Mrs. Mary Gillespie Bowe moved that they be substituted as parties plaintiff, which motions were submitted, and the Court allowed the motion to substitute parties plaintiff and overruled the motion for a new trial, and on the cause being again submitted, judgment was rendered in favor of Mrs. Mary Gillespie Bowe, individually, in the sum of $8,000, and in favor of Mrs. Emma C. Gillespie, widow, and Mrs. Bowe, sole heir of George E. Gillespie, in the sum of $1250.35, the amount found by the court to have been expended by George E. Gillespie in having his daughter treated, under which judgment defendant appealed, and plaintiffs have answered the appeal, praying that the amount awarded be increased.

While counsel have urged all of the questions which were presented in the trial court, however, in view of the conceded fact that pulmonary tuberculosis is a disease of which the exciting cause is tubercle bacilli, and of the evidence which conclusively establishes that there was not any disability or infirmity which can be traced to the accident, without regard to the disease, it clearly appears that the damages claimed and awarded are traceable to the disease, and as it must be conceded that plaintiffs cannot recover unless the evidence establishes that the accident was the proximate cause of the disease, we consider that question.

At the time of the accident, Miss Gillespie, who was then above 18 years of age, was on her way to attend her classes at Centenary College, and the car in which she was riding was being driven south along Fairfield Avenue, in advance of the car belonging to defendant, which was being driven by defendant's chauffeur, and as Mrs. Gillespie turned her car to the right towards the curb and brought it to a stop (in response to the request of her daughter, who desired to invite a young man, who was also a student at Centenary College, to accompany her to school) the car was struck by the automobile driven by the chauffeur, the front bumper of the car driven by the chauffeur coming in contact with the left end of the rear bumper of the Gillespie car. There was not any damage to the cars, and no one present thought at the time that Miss Gillespie had sustained any injury, and the evidence shows that after the accident she went on to school, and although Mrs. and Miss Gillespie state that she left school about ten o'clock, the attendance records of Centenary College which were also offered in evidence by plaintiff, show that she attended her classes on the day of the accident, which would have required her presence until noon. The only pain claimed to have been experienced by Miss Gillespie as the result of the accident is stated by her to have been that her throat and back were sore a few days after the accident, which does not, however, appear to have discommoded her, as she continued to attend her classes. On April 17, 1925, about one month after the accident, Miss Gillespie consulted an associate firm of physicians and was referred to one of the members of the firm who specialized in diseases of the throat, etc., who found that her tonsils were infected and advised that they be removed, and, on April 24th, after an examination was made, in which it was found that Miss Gillespie had a slight degree of fever, her tonsils were removed. But the fever continuing and the physician who removed her tonsils and who had continued to attend her, finding some involvment of the lungs, called in an associate physician to whom his firm usually referred patients having diseases of the chest, who on an examination found some involvment of the lungs, which he at the time attributed to the operation or the anaesthetic which had been administered at the time. The condition not yielding to treatment, a radiograph was taken of the lungs on May 25th, which revealed that Miss Gillespie had tuberculosis, for which he treated her until some time in July when she, accompanied by her mother, went to a sanitorium in Colorado, where she arrived about July 28th. She was examined at the sanitorium and the same condition revealed by the radiograph on May 25th was found to still exist, and the physician in charge of the sanitorium, in consultation with another eminent physician, after a history of the case had been given expressed the opinion that the accident was the cause of the disease, and the

senior member of the firm of physicians (one of whom had removed Miss Gillespie's tonsils and another who had attended her after the removal of her tonsils) who was a visitor at the sanitorium after consultation with the other physicians expressed the same opinion, and all of them were called as witnesses on behalf of plaintiff.

It is conceded that pulmonary tuberculosis is an infectious disease and that the tubercle bacilli are brought in with the inhaled air, and the physicians called by the parties agree that tubercle bacilli are always present in the system, and also that everyone has tuberculosis in a latent or quiescent state, and while they also agree that the usual precipitating cause of the disease is lack of vitality or power of resistance to infection, which may result from many causes, it is conceded that the disease may be precipitated by an injury.

And, although it is not so expressly stated, we gather that the theory of plaintiffs' case is that Miss Gillespie sustained an injury of the lungs at the time of the accident and that the bacilli present in the system were implanted in and found suitable soil for growth in the contusion or lesion resulting from the injury, thus causing the development of the disease, or that the injury broke up a latent tubercular lesion in the lungs, letting loose the tubercle bacilli, causing the disease to be reactivated.

In this connection we refer to the hypothetical questions propounded to the physicians called by plaintiffs, and the excerpts from the works of recognized medical authorities relative to the probability of tuberculosis being developed or reactivated by an injury, which were introduced and read into the record in connection with the evidence of the physicians.

In the questions propounded to the physicians, the facts relative to the removal of the tonsils and final diagnosis of the disease on May 25th, were stated, and it was assumed that Miss Gillespie had good health, splendid vitality and energy prior to the accident, and facts were also assumed tending to show that she had sustained a shock or blow on her chest at the time of the accident, and to show that the symptoms of the disease appeared soon after the accident, and they were requested to express an opinion as to the cause of the disease. In answer, one of them said, "Trauma resulting from the accident"; another, "The tubercle bacilli was the cause of the tuberculosis; the precipitating cause was most probably the motor accident"; and the third, "I would unquestionably attribute the condition to the injury received."

In the excerpts, one of the authors, Dr. Fishberg, says: "Many cases have been observed in which latent tuberculosis lesions in the lungs have been stirred into activity soon after an injury," and that "the intensity of the injury should not be taken as the measure of the probability of its relation to phthisis subsequently developed as has been pointed out by many authors, after violent injuries to bones and joints, especially those resulting from fractures, tuberculosis osteomyelitis is hardly ever observed. During the World War, very few gunshot wounds of bones and joints, especially of the chest, were followed by tuberculosis lesions in these tissues. On the other hand slight injuries to bones have frequently been seen to precede tuberculosis osteomyelitis. In the same manner the writer has seen in several cases a slight injury to the chest flaring up a latent or quiescent process in the lungs. In persons known to be healthy this is not un-

common." The same author further states that, "The site of the lesion provoked by an injury is not necessarily at the point affected by the blow. Many authors have reported lesions by contrecoup. An acute or general miliary tuberculosis may also result from breaking up a latent lesion and letting loose tubercle bacilli in the blood stream. Hemoptysis is not absolutely essential to establish the relationship between the injury and the phthisis, because laceration of the lung may occur without causing hemorrhage. Nor must there remain any external marks on the chest wall because an injury may lacerate the lung or pleura without leaving any external traces." And he refers to another author who says that, "The only explanation we can offer for tuberculosis following traumatism is that after a contusion of the lung, the pulmonary tissue is devitalized, so that the tubercle bacilli brought in by the inhaled air will find suitable soil for growth."

Dr. Pottenger, another of the authors, says that, "For cases of active clinical tuberculosis to be definitely assigned to trauma as the agency in their active causation, the symptoms must appear promptly following the injury. The spreading must take place within the time that implantation and the development of tuberculosis would usually occur—that is, within a period of a few weeks. In this connection we must realize that it is possible for bacilli to be mobilized in small numbers and produce very small metastic foci. Clinical tuberculosis might result from such an infection, yet require a considerable time for the bacilli to be implanted and form new metastases; and in such cases, it might be difficult to give an accurate opinion. In such cases, however, where the symptoms show themselves within a few weeks after the injury, the relationship can hardly be doubted."

Although there was not any explanation of the rather technical language used by the authors who appear to have been stating their observations for consideration by the profession, it was conceded that they refer to two classes of the disease, one of the bones, and the other of the lungs, and there was some explanation of the reason why an intense injury of such tissues would be less likely to cause the disease than injuries of other characters; yet we gather from the excerpts insofar as they may be relevant to the present case and the answers of the physicians to the hypothetical question propounded to them, that the conclusion of the physicians was that Miss Gillespie's lungs had been injured at the time of the accident, and although it is not so stated, that the tubercle bacilli had been implanted and found suitable soil for growth in the contusion or lesion resulting from the injury, and thus developed the disease, or that the injury had broken up a latent tubercular lesion in the lungs letting loose the tubercular bacilli and thus precipitated the disease, and, as stated, we assume that the theory of plaintiffs' case is that the accident was thus the direct and proximate cause of the disease.

From this point of view, we think that, although the exciting cause of the disease was the tubercle bacilli, the plaintiff's right to recover for the damages resulting from the disease is distinguishable from the case presented in Caldwell vs. City of Shreveport, 150 La. 465, 90 So. 763, and is supported by the ruling in Larson vs. Boston Elevated Ry. Co., 212 Mass. 262, 98 N. E. 1048. However, under this theory of the case, considered in connection with the excerpts (from which we gather that, in order for an injury of the lungs to be

definitely assigned as the direct cause of the disease, it is necessary that the symptoms of the disease appear soon after the injury), it is essential that the evidence should establish that there was an injury of the lungs at the time of the accident, and that the symptoms of the disease appeared soon thereafter.

Of these essentials, the basic one to be established is that, there was an injury of the lungs as the result of the accident; and while, as suggested by defendant, the physicians called by plaintiff in arriving at their conclusion that there was such an injury, appear to have given preponderant weight to the assumption that the symptoms of the disease appeared soon after the accident, or, as one of them in explanation of his answer to the hypothetical question, said, "I base my opinion on the fact that the symptoms of the disease followed this collision within the expected time," we do not think their opinions can be disregarded, and the statement of the physician who was called in to attend Miss Gillespie after the removal of her tonsils, and who expressed the opinion that the accident was not the cause of the disease, accepted as decisive of the case.

While the excerpts indictate that, when there is a known injury of the lungs and the symptoms of the disease appear soon thereafter, it should be inferred that the injury had caused the development or reactivation of the disease, it is not indicated that, where the disease appears soon after an accident it should be inferred that the lungs were injured at the time of the accident, and considering the evidence of the physicians called by plaintiff as a whole, we do not think they based their conclusion that the lungs were injured at the time of the accident solely on the assumption that the symptoms of

the disease followed soon after the accident or collision, but that they considered the other factors suggested in the hypothetical question, which were as stated that, Miss Gillespie had sustained a shock or blow on her chest at the time of the accident and that she was in good health at that time, and one of the physicians also stated that one of the factors considered by him was his finding that the disease was of an acute or miliary type.

The evidence does not show that the symptoms developed by Miss Gillespie were the usual ones apparent when the disease is of an acute or miliary type, nor does it show that the acute or miliary type of the disease is peculiar to those cases when the disease is developed or reactivated by an injury. And although, as stated, we are satisfied that the physicians in arriving at the conclusion that Miss Gillespie's lungs were injured at the time of the accident gave consideration to the facts assumed showing that Miss Gillespie sustained a shock or blow on her chest at the time of the accident and that she was in good health at that time, they did not state what consideration was given to those factors.

As previously stated, the evidence shows that the disease is usually developed or reactivated by reason of loss of vitality or power of resistance to infection, which may result from many causes, and that it is usually impossible to determine the precipitating cause, or as we gather, the approach of the disease is insidious and that it is usually impossible to distinguish the precipitating cause of the disease from the predisposing cause, and even though it should be conceded that Miss Gillespie did sustain a shock or blow on her chest at the time of the accident, and that she was in good health at that time and that

the symptoms of the disease appeared soon thereafter, it does not appear that it would necessarily follow that the accident was the cause of the disease or that her lungs were injured at the time of the accident, in default of proof that persons in good health may not be infected by the bacilli, or that the approach of the disease as to such persons is marked by indications of loss of vitality or power of resistance to infection.

Conceding, however, that when it is shown that a person in good health is in an accident and the disease appears soon thereafter, would be circumstances tending to show that there was some connection between the accident and the disease or that the lungs may have been injured at the time of the accident, such factors would not of themselves, in default of evidence that the subject had sustained a shock or blow of sufficient violence to have injured the lungs, be of great weight, and even if all of the factors were established, it would only raise a presumption that there was some connection between the accident and the disease or that the lungs were injured at the time of the accident, the force of which would depend upon whether the factors were satisfactorily established.

In the hypothetical question propounded to the physicians, the facts assumed showing that Miss Gillespie had sustained a shock or blow on her chest at the time of the accident were stated as follows: "Take the case of a young girl sixteen years of age who was in an automobile accident on March 16, 1925, and in that collision she was thrown forward, striking her chest on the front of the car and then jerked back against the seat," and "that this girl was rendered unconscious" and "that she suffered a severe hemorrhage from the nose that night and from time to time for about two weeks," and the facts as to her condition prior to the accident were that, "she had unusual good health, splendid energy, splendid vitality, scarcely ever tired," while the facts tending to show when the symptoms of the disease appeared were that "about two weeks after the accident she began to lose her appetite, energy, ambition to work," and "had temperature ranging around ninety-nine which continued for some time," and assuming that the physicians considered all of the factors suggested, we refer to evidence in support of same.

The facts assumed showing that Miss Gillespie had sustained a shock or blow on her chest at the time of the accident were substantially supported by the testimony of Miss Gillespie and Mrs. Gillespie, while the chauffeur and a friend who was riding with him stated that Miss Gillespie was not thrown forward by the impact of the car.

It is shown that a hemorrhage from the nose does not indicate an injury of the lungs, and while the trial court accepted the statement of Miss Gillespie and her mother and concluded that Miss Gillespie had sustained a shock or blow on her chest of some violence, the court did not find that Miss Gillespie had been rendered unconscious.

While there are as many, if not more discrepancies in the testimony of Mrs. Gillespie and Miss Gillespie as are in the testimony of the chauffeur and his friend, Miss Gillespie testified that her throat and back were sore on the day of the accident, and defendant called a witness who had talked with Mrs. Gillespie who stated that Miss Gillespie's neck was sore and also offered an affidavit made by Miss Gillespie several months

after the accident in which she states that her neck and back were sore a few days after the accident, we think the preponderance of the evidence shows that Miss Gillespie did sustain some shock or blow at the time of the accident, but we do not find that the evidence establishes that she was rendered unconscious, or that the shock or blow was violent.

There were two friends of the Gillespies present at the time of the accident, who were called as witnesses in her behalf, and although it appears that they went immediately to the Gillespie car, neither mentioned that Miss Gillespie was unconscious (although Mrs. Gillespie stated that her daughter was unconscious for an appreciable time, in which she had taken her in her arms and rubbed her forehead) and it is shown that neither of the friends nor Miss Gillespie thought that she had been injured, nor did Miss Gillespie, in the affidavit referred to (which appears to have been made in connection with an action which Mrs. Gillespie contemplated at that time bringing in her own behalf) mention that she had been rendered unconscious.

As stated, there was no damage to the cars or bumpers which came in contact, and while the statement of Mrs. Gillespie and Miss Gillespie as to the manner in which the impact of the cars was communicated to Miss Gillespie would indicate that the shock or blow was violent, it also indicates that the reaction was unusual and that there were two shocks. As if Miss Gillespie was sitting on the seat in the usual manner the tendency would have been for the impact against the rear of the car to have first thrown her against the back of the seat, and while the opinion of Mrs. Gillespie was that her car was driven against the curb by the impact of

defendant's car would account for two shocks, the evidence shows that the Gillespie car was not driven against the curb. The evidence also conclusively shows that there were not any abrasions, bruises or other marks on Miss Gillespie's body indicating that the blow was violent, and, as stated, Miss Gillespie, after the accident, continued on her way to school where she attended her classes, and although she made some complaint of soreness of her throat and back, the pain was not sufficient to discommode her to any extent, as her evidence shows that she attended her classes and kept up rather vigorous exercises after the accident.

And we do not think the evidence establishes that the shock or blow on the chest, which may have been sustained by Miss Gillespie, rendered her unconscious or that it was violent.

It is conceded that the lungs are well protected, and that it will usually require a shock or blow on the chest of considerable violence to injure the lungs, and while we gather from the evidence of the physicians called by plaintiff that it is not always necessary that the blow or shock should be of considerable violence, one of the physicians called by defendant stated that it would require a blow of sufficient violence to render the subject unconscious.

There was not any explanation of the conditions under which a shock or blow on the chest would not have to be of considerable violence to injure the lungs, nor of the reason why the shock or blow would have to be of such violence as to render the subject unconscious, and we cannot say which of the opinions was correct, but, considering the circumstances attending and following the accident, which do not indicate that the shock or blow

sustained by Miss Gillespie was violent, and the testimony that it would usually require a shock or blow on the chest of considerable violence to injure the lungs, we do not think the evidence shows more than a possibility that the shock or blow sustained by Miss Gillespie could have injured her lungs.

Relative to the time when the disease appeared and the state of Miss Gillespie's health prior to the accident, it was, as stated, assumed in the hypothetical question that Miss Gillespie was in good health and had splendid vitality and energy prior to the accident, and the facts tending to show when the symptoms of the disease appeared were that, "about two weeks after the accident she began to lose her appetite, energy and ambition to work," and "had temperature ranging around ninety-nine for some time." While it is shown that Miss Gillespie had led an active life since early childhood, and that she had good health, vitality and energy, and that she had not had any illness which was regarded as serious until following the removal of her tonsils, it is shown that she had an attack of influenza with some degree of fever, sore throat and cough, about January 7th, preceding the accident, and subsequently, on April 17th, her tonsils were again examined and found to be infected and at that time she had some degree of fever, which latter condition, the evidence affirmatively shows, had existed since about ten days or two weeks after the accident, when the evidence shows that Miss Gillespie began to lose her appetite and energy, about which time she discontinued her dancing exercises, although she continued to attend her classes at school until the date of the operation.

At the time of the operation, Miss Gillespie's lungs were examined by a physician connected with the hospital where the operation was performed, and his report to the physician who performed the operation, and his evidence on the trial of the case shows that he did not find any involvment of the lungs, and the physician who was called in to attend Miss Gillespie after the removal of her tonsils stated that he was of the opinion that the disease was on the verge of being developed or reactivated at the time the operation was performed. It is conceded that the usual symptoms of the development or reactivation of the disease is loss of appetite, lassitude and a slight degree of fever, and while the physicians called by plaintiffs fix the appearance of the disease at the time, or about ten days after the accident when the evidence shows that Miss Gillespie began to lose her appetite and energy and developed a slight degree of fever, nevertheless, as stated, the examination made by the physician some weeks after that time showed that there was not any involvment of the lungs, and the opinion of the attending physician was that the disease was on the verge of being developed or reactivated at that time, and the evidence further shows that the symptoms of the disease are the same as when one has infected tonsils, which the evidence shows that she had prior and subsequent to the accident, which condition the physician, who removed her tonsils and who had examined her in January, stated was chronic.

While it is apparent from the evidence that the symptoms of the disease are not always observable by all persons, the experts concede that there is a marked distinction between the latent and the active disease, and that when the disease is active there will be some indication in the lungs of such activity and considering that

the examination made by the physician several weeks after the time when the physicians called by plaintiffs fix the date the disease became active, did not show any involvment of the lungs, and that the symptoms which, it is assumed, evidenced the reactivation of tuberculosis are common to infected tonsils, which the evidence indicates Miss Gillespie had at the time, we do not think the preponderance of the evidence establishes that the symptoms of the disease appeared within ten days or two weeks after the accident, and that the evidence leaves the date of the appearance of the disease uncertain.

The same uncertainty as to whether Miss Gillespie was in good health prior to the accident is, we think, reflected by the evidence, as it is shown, as stated, that there was a chronic infection of the tonsils and the history given of the case at the time of the operation was that she had had frequent colds and sore throat since January, which condition, the evidence shows, often precedes the development or reactivation of pulmonary tuberculosis. And, although the evidence does not indicate that Miss Gillespie had any symptoms of the disease immediately prior to the accident, the experts do not state that she was in good health, although we gather from the evidence of the experts called by plaintiffs that they did not consider that the conditions prevailing prior to the accident established that there was any precipitating cause of the disease.

The question, however, is not whether the evidence establishes any other cause which could be assigned as the precipitating cause of the disease, but whether or not it establishes that the accident was the precipitating cause of the disease, and, as the evidence at least leaves in doubt whether Miss Gillespie sustained a shock or blow of sufficient force to have injured her lungs and whether she was in good health at the time of the accident and when the symptoms of the disease appeared, the factors on which any presumption that the accident was the precipitating cause of the disease, or that Miss Gillespie's lungs were injured at the time of the accident, could be based, and the eminent physicians disagreeing, the evidence fails to establish that the accident was the proximate cause of the development or reactivation of the disease.

It is therefore ordered that the judgment appealed from be avoided and reversed and that plaintiff's demands be rejected at their cost.